KHAI LEQUANG (SBN 202922)
klequang@orrick.com
RICHARD W. KREBS (SBN 278701)
rkrebs@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main Street
Suite 1100
Irvine, CA  92614-8255
Telephone:  +1 949 567 6700
Facsimile:  +1 949 567 6710

Attorneys for Plaintiffs SKELLIG ICAV, acting
solely in respect of its sub-funds, GANNET LIFE
SETTLEMENT FUND I and GANNET FUND
II; and WILMINGTON TRUST, NATIONAL
ASSOCIATION, as securities intermediary for
SKELLIG ICAV, in respect of SKELLIG ICAV's
sub-funds, GANNET LIFE SETTLEMENT
FUND I and GANNET FUND II

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKELLIG ICAV, acting solely in respect of its sub-funds, GANNET LIFE SETTLEMENT FUND I and GANNET FUND II; and WILMINGTON TRUST, NATIONAL ASSOCIATION, as securities intermediary for SKELLIG ICAV, in respect of SKELLIG ICAV's sub-funds, GANNET LIFE SETTLEMENT FUND I and GANNET FUND II, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.) <br><br> Defendant. | Case No. 2:22-cv-06421 <br><br> **COMPLAINT** <br><br> **FOR:** <br><br> **1. BREACH OF CONTRACT;** <br><br> **2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (CONTRACTUAL);** <br><br> **3. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (TORTIOUS);** <br><br> **4. CONVERSION; AND** <br><br> **5. DECLARATORY RELIEF** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Skellig ICAV, acting solely in respect of its sub-fund, Gannet Life Settlement Fund I, solely in respect to the policies at issue that Gannet Life Settlement Fund I is the beneficial owner of, and acting solely in respect of its sub-fund, Gannet Fund II, solely in respect to the policies at issue that Gannet Fund II is the beneficial owner of (Gannet Life Settlement Fund I and Gannet Fund II are collectively referred to as the "Gannet Funds"); and Wilmington Trust, National Association ("Wilmington Trust"), solely in its ministerial capacity as securities intermediary for Skellig ICAV, in respect of Skellig ICAV's sub-funds, the Gannet Funds (in such capacity, "Securities Intermediary") (collectively, "Plaintiffs"), by and through their attorneys, file this Complaint against Defendant John Hancock Life Insurance Company (U.S.A.) ("John Hancock"), and allege as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1), (2), and (3) because (a) the action involves plaintiffs who are citizens of Ireland and Delaware (as described below), and a defendant that is a citizen of Massachusetts and Michigan, and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      This Court has personal jurisdiction over John Hancock because John Hancock regularly conducts and transacts business in California, including having issued several of the life insurance policies at issue in California.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because John Hancock conducts business in the Central District of California, and a substantial part of the events giving rise to the claims occurred in this judicial district, including John Hancock's issuance of certain of the policies that are at issue in this Complaint.

## NATURE OF THE ACTION

4.      Plaintiffs bring this action seeking compensatory and punitive damages, equitable relief, and attorneys' fees based on John Hancock's unlawful increasing of the cost of insurance (sometimes referred to herein as "COI") rates on a targeted

COMPLAINT

group of its in-force Performance UL life insurance policies (collectively, the "COI Increases"), including the policies at issue in this case owned by Plaintiffs ("Plaintiffs' Policies").  While John Hancock has not disclosed the criteria used to define this targeted group (the "Discriminated Group"), it appears to be comprised of disproportionate numbers of investor-owned policies and policies originally issued to older-aged insureds.  By raising the cost of insurance rates without a proper basis and, on information and belief, only on the Discriminated Group, John Hancock has breached the terms of Plaintiffs' Policies.

5.     Plaintiffs' Policies are universal life insurance policies.  Broadly speaking, life insurance falls into one of two generic categories: (a) term life insurance and (b) cash value life insurance.

6.     Term life insurance provides protection for a limited number of years. The insurer pays the death benefit to the policyholder if the insured dies during the stipulated term (such as 10 or 20 years).  If the insured survives the term (i.e., the term expires and the insured is still alive), or if premiums are not paid, the policy expires with no value.

7.     "Cash value" life insurance combines the term insurance component with a savings or "cash value" component.  Unlike term insurance, cash value life insurance can remain in force for the insured's entire life so long as the policyholder maintains a positive account value.  Premiums paid to fund cash value life insurance policies accumulate value over time.  The insurer earns interest on the accumulated value and credits a portion of that interest to the policyholder's account.  The insurer uses the accumulated value to fund the death benefit once the policy matures. Whether the insured dies when the policy has a high or low accumulated value, the insurance company pays the same death benefit, equal to the face value of the policy, because the accumulated value is part of the death benefit.

8.     Universal life insurance is a form of cash value life insurance also known as "flexible premium" adjustable life insurance.  Like other cash value

policies, universal life insurance includes (a) the "mortality" component, for which the insurance company charges a cost to cover the risk of the insured's death (the "cost of insurance"), and (b) a "cash value" component, where premiums paid in excess of the cost of insurance (and certain other policy charges) accumulate (the "account value," which is referred to as the "Policy Value" in Plaintiffs' Policies) and earn interest at a rate that will not be lower than an "annual guaranteed credited interest rate" (generally referred to in the life insurance industry as the "guaranteed minimum crediting rate" because the interest is "credited" to the policyholder's account). The Policy Value is used to fund the policy charges, including the cost of insurance charges, and it makes up part of the death benefit. In other words, the Policy Value is part of the coverage of the life insurance policy: it is paid out only upon the death of the insured, and a policyholder cannot withdraw the Policy Value except by terminating the policy or reducing the death benefit by the same amount. When the insurer pays out the death benefit, it makes no distinction between the Policy Value and the remaining portion of the death benefit—referred to as the Net Amount at Risk. Indeed, insurance companies design some universal life insurance policies to be funded in a way that the Policy Value equals the death benefit at age 100.

9. John Hancock holds the Policy Value for Plaintiffs subject to the terms of Plaintiffs' Policies. Plaintiffs may access the Policy Value through procedures described in Plaintiffs' Policies. Plaintiffs may access the Policy Value without cost or subject to a nominal fee, depending on the terms of the specific policy and how long that policy has been active.

10. Universal life insurance is designed to give policyholders flexibility, particularly with respect to the payment of premiums. This can be demonstrated by comparing universal life insurance to another type of "cash value" life insurance—whole life insurance. With whole life insurance, a policyholder pays fixed monthly premium payments for the life of a policy. These fixed monthly premium payments

include an amount associated with the cost for the insurance company to bear the risk of the insured's death (i.e., the cost of insurance) but also an additional amount intended to accumulate a "cash value" that earns interest over time, like the account value in a universal life insurance policy.  In the insured's earlier years, the fixed monthly premium payments of a whole life policy are typically far higher than the actual cost of the insured's risk of death, and most of the premiums are used to accumulate cash value that will be used to fund the cost of insurance charges in the later years of the insured's life, when the fixed monthly premium payments are likely to be lower than the actual risk of death.  That is, the "cash value" build-up in the earlier years operates as a "reserve" to pay the death benefit in the later years.

11.   Universal life insurance "unbundles" these two components of a whole life insurance policy (a) so that the funding of the policy is transparent to the policyholder, who can see how the insurance company applies his or her premium payments and what the company deducts for policy charges and credits as interest to the policy account, and (b) to allow the policyholder to decide how much premium to pay, including choosing whether to pay just enough premiums to cover the risk of death (i.e., pay solely for the life insurance) or pay more (subject to certain limitations) and build up a cash value that earns tax-deferred interest (which, among other things, is used to fund the death benefit and can also be used to pay for the cost of insurance in the future).  Notably, interest earned on the account value is tax deferred because the account value is part of the insurance.

12.   Although there is no fixed monthly premium payment that is due under a universal life insurance policy, if the balance in the policy account is insufficient to cover the policy's monthly charges, which includes the cost of insurance and certain other policy charges, the policy will enter a grace period and lapse unless additional premiums are paid.

13.   Universal life insurance policies have both guaranteed and non-guaranteed elements.  Guaranteed elements are fixed and determined at a specific

COMPLAINT

time, such as when the policy was issued. Non-guaranteed elements, on the other hand, are not fixed at a specific time and can be adjusted by the life insurance company under the terms of the policy. An example of a guaranteed element is the guaranteed minimum crediting rate. An example of a non-guaranteed element is the cost of insurance rate, which is what John Hancock charges to bear the risk of the insured's death.[1]

14. Although Plaintiffs' Policies permit John Hancock to adjust the cost of insurance rates (by increasing or decreasing them), they restrict John Hancock's ability to do so in at least two important ways. First, John Hancock may only change cost of insurance rates based on its reasonable expectations as to "future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions" (or substantially similar language). So, for example, COI rate increases made to increase John Hancock's profitability, or to recoup past losses, are impermissible. Second, any change in cost of insurance rates must be "on a basis that does not discriminate unfairly within any class of lives insured" (or substantially similar language). COI rate increases that target some Performance UL policies but not others or apply to some members of a class but not others without a reasonable actuarial basis are discriminatory and unlawful.

15. To better understand the basis for John Hancock's sudden and massive COI Increases, counsel for Plaintiffs, on behalf of other plaintiffs in a related litigation, attempted to obtain the information that John Hancock relied on to justify the COI Increases, including John Hancock's original pricing assumptions (including mortality assumptions) and evidence of its alleged adverse experience (including mortality experience), but John Hancock ignored these requests. Plaintiffs' counsel

---

[1] While some of Plaintiffs' Policies refer to this as the "Applied Monthly Rate," many universal life insurance policies, including many of Plaintiffs' Policies, refer to this as the "cost of insurance" rate because it is the rate that the insurance company charges for the mortality risk.

also made public records requests for information about John Hancock's rate increases to state insurance regulators, including the New York State Department of Financial Services ("NYDFS").  NYDFS responded that it had documents responsive to Plaintiffs' counsel's requests, but that John Hancock had objected to NYDFS producing those documents on the basis they were confidential and trade secret. After further correspondence, NYDFS produced a handful of heavily redacted documents that revealed very little about the COI Increases.

16.    Notwithstanding John Hancock's efforts to conceal information about the COI Increases, Plaintiffs have good reason to believe the COI Increases breach Plaintiffs' Policies in multiple ways.  To begin with, the most important assumption in life insurance is mortality.  Yet it is well-known in the life insurance industry that since John Hancock began issuing the Performance UL policies in 2003, *mortality has improved*, not worsened.  This improvement in mortality has resulted in new life insurance mortality tables that would, if anything, support a *decrease*, not increase, in cost of insurance rates.  Despite this, John Hancock *increased* COI rates on Plaintiffs' Policies, in blatant breach of Plaintiffs' Policies' express and implied terms and conditions.

17.    Industry analysts also have confirmed that mortality has continued to improve.  For example, in 2016, Towers Watson, which insurers like John Hancock frequently cite to, published a report with recommendations for mortality improvement assumptions for life insurance companies.  All assumptions over age 55 are positive improvements, meaning that Towers Watson expects that mortality will continue to improve at every age.  Similarly, statistics published by The Human Mortality Database (HMD, organized by the Department of Demography of the University of California, Berkeley) show increases in life expectancy and lowering of mortality rates between 2010 and 2015 for older-aged individuals in the United States.  And a Society of Actuaries (SOA) report on historical population mortality rates shows continuing mortality improvements every five years between 2000-2014.

COMPLAINT

18.     John Hancock says that it partly relies on this type of industry data in setting its mortality expectations, stating that "[m]ortality assumptions are based on our internal as well as industry past and emerging experience," and that it makes "assumptions about future mortality improvements using historical experience derived from population data."[2]  Any suggestion by John Hancock that its mortality expectations have developed in a way that is the opposite of the industry is implausible.  Given this consistent trend of improving mortality expectations, John Hancock should have **_decreased_** COI rates on Plaintiffs' Policies.  Instead, it raised COI rates dramatically, allegedly based on worse mortality expectations than those at issuance.  Even if John Hancock had some decline in its mortality expectations, contrary to the industry, that decline could not be close to warranting the massive COI Increases seen here.

19.     John Hancock admitted as recently as February 2016 that its "anticipated experience factors underlying any nonguaranteed elements [including cost of insurance] are not different from current experience."  This means that John Hancock's expectations of future mortality experience had not differed from its original expectations, and that no COI rate increases were on the horizon.  There have not been adverse experience and expectations within recent years, or since February 2016, that could justify an increase in COI rates, and certainly not one of this size.  Mortality—by far the biggest driver of COI rates—has been improving industry-wide at a rate of approximately 1% per year.  Even in the unlikely event that John Hancock has not shared in this mortality improvement, its mortality expectations could not have deviated so significantly in just two years to justify the COI Increases seen here.

20.     Furthermore, the COI Increases were not uniform among policyholders as required by the terms of Plaintiffs' Policies.  Plaintiffs' Policies expressly promise

---

[2] MANULIFE FINANCIAL CORPORATION, 2017 ANNUAL REPORT 68 (2017), http://manulife.force.com/servlet/servlet.FileDownload?file=00P50000010BL5xEAG&ver=10.

COMPLAINT

that any increase in cost of insurance rates must be "on a basis that does not discriminate unfairly within any class of lives insured" (or substantially similar language). The COI Increases breach this provision because John Hancock applied increases to some Performance UL policies and not others, in materially different amounts, without any contractual or acceptable actuarial reason for that discrimination. Indeed, while John Hancock told its agents in May 2018 that it decided to increase COI rates on "approximately 1,500" Performance UL policies out of a larger subset of 4,000 Performance UL policies issued between 2003 and 2010, John Hancock did not disclose why it chose that subset of 4,000 policies to review, nor why it increased rates on only 1,500 of those 4,000 policies.

21.     Tellingly, John Hancock did not increase COI rates on any of its other universal life products issued between 2003 and 2010, even though it told regulators that its mortality experience is "allocated across product lines." By drastically raising COI rates by as much as 75% on only the Discriminated Group, it is apparent that John Hancock seeks to force Plaintiffs and other members of the Discriminated Group either to (a) pay exorbitant premiums that John Hancock knows will no longer justify the ultimate death benefits, or (b) lapse or surrender their Performance UL policies and forfeit the premiums they have paid to date, thereby depriving policyholders of the benefits of their policies. John Hancock, in turn, will make a huge profit—either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the vast majority of the premiums they have paid to date on them.

22.     It is apparent from John Hancock's own statements that John Hancock implemented the COI Increases to boost profits. On a November 2017 earnings call for Manulife Financial Corporation (John Hancock's parent company, which reports on behalf of John Hancock in consolidated financial statements), Manulife's CEO acknowledged that the company's North American legacy business (which, on information and belief, includes Plaintiffs' Policies) is "generating returns that are

less than acceptable." On this November 2017 earnings call, Manulife's CEO further stated that Manulife's "number one" priority is to "aggressively manage" its legacy blocks to "increase profitability and cash generation," and that "shareholder returns" will be a big part of how Manulife measures "progress in our legacy business." Increasing its profit margins on its life insurance business, including the Performance UL policies owned by the Discriminated Group, was at the forefront of John Hancock's agenda when it announced the COI Increases.

23.    Notably, in recent years, a handful of life insurance companies have increased cost of insurance rates despite consistent improvements in U.S. mortality over the past several decades. These rate increases have prompted numerous lawsuits, all of which, to Plaintiffs' knowledge, have resulted in the insurance companies paying out millions of dollars in settlements or verdicts. John Hancock itself recently settled a lawsuit concerning its failure to lower cost of insurance rates—despite improved mortality—for over $91 million.

24.    In apparent response to complaints about similar COI rate increases made by other universal life insurance companies over the last several years, NYDFS recently enacted a new regulation that protects policyholders from unjustified life insurance premium increases. Among other things, NYDFS Insurance Regulation 210 ("Reg 210") mandates the examination, as needed, of "anticipated experience factors at specified times and under specified conditions but no less frequently than required by law to determine if the factors are reasonable." Reg 210 § 48.2(a)(1), 48.2(f)(2). The regulation defines experience factors as "investment income, mortality, morbidity, persistency, or expense that represents the insurer's financial experience on a class of policy" and emphasizes "[p]rofit margin is not an experience factor." Reg 210 § 48.1(h).

25.    In announcing the proposed regulation in a press release dated November 17, 2016, NYDFS Superintendent Maria Vullo declared that New York "will not stand by and provide life insurers free reign to implement unjustified cost

COMPLAINT

of insurance increases on New Yorkers simply to boost profits."[3]

26.     An article in *The Wall Street Journal* published the same day notes that the New York regulation "could be widely copied by other [states'] insurance departments."[4]  A little more than a year later, California enacted a law similar to the New York regulation aimed at protecting policyholders from unjustified cost of insurance increases.[5]  The new law took effect on April 1, 2019.  Cal. Ins. Code § 10113.7.  Texas, too, has taken action.  On June 14, 2019, Texas enacted its own law seeking to protect policyholders from unlawful cost of insurance rate increases.[6]  The law, which the Texas House of Representatives and Senate both unanimously passed, took effect September 1, 2019.  Tex. Ins. Code Ann. § 1101.204.

27.     Regulators have not only taken aim at the insurance companies for improperly attempting to increase cost of insurance rates, they have also condemned those companies for failing to adequately disclose to policyholders the risk of future cost of insurance rate increases.  In the words of former NYDFS Superintendent, Linda Lacewell, "DFS takes consumer protection very seriously and will take all actions necessary to ensure that policyholders are not being misled by insurers and

---

[3] *See* Press Release, NYDFS, *DFS Proposes New Regulation to Protect New Yorkers from Unjustified Life Insurance Premium Increases* (Nov. 17, 2016), http://www.dfs.ny.gov/about/press/pr1611171.htm.

[4] Leslie Scism, *New York Regulator Aims to Require Life Insurers Justify Higher Rates on Old Policies*, Wall St. J. (Nov. 17, 2016), http://www.wsj.com/articles/new-york-regulator-aims-to-require-life-insurers-justify-higher-rates-on-old-policies-1479394201.

[5] Press Release, Cal. Dep't of Ins., *Commissioner-Sponsored Life Insurance Bill Signed by Governor to Protect California Consumers* (Sept. 19, 2018), http://www.insurance.ca.gov/0400-news/0100-press-releases/2018/release115-2018.cfm.

[6] HB 207, Texas Legislature Online: History, https://capitol.texas.gov/BillLookup/History.aspx?LegSess=86R&Bill=HB207 (last visited August 25, 2022).

COMPLAINT

agents offering often complex products."[7]

## **THE PARTIES**

28.     Wilmington Trust is a national banking association with its principal place of business in Wilmington, Delaware.  Wilmington Trust is appearing as a Plaintiff solely in its capacity as Securities Intermediary for Skellig ICAV, in respect of Skellig ICAV's sub-funds, the Gannet Funds.

29.     Plaintiff Skellig ICAV is an umbrella Irish collective asset-management vehicle with segregated liability between its sub-funds, registered under the Irish Collective Asset-Management Vehicles Act 2015 and authorized as a qualifying investor alternative investment fund by the Central Bank of Ireland with registration number C185002, acting solely in respect of its sub-fund, Gannet Life Settlement Fund I, with registration number C185499 and having its registered office in Dublin, Ireland, solely in respect to the policies at issue that Gannet Life Settlement Fund I is the beneficial owner of, and Gannet Fund II, with registration number C191291 and having its registered office in Dublin, Ireland, solely in respect to the policies at issue that Gannet Fund II is the beneficial owner of.  The Gannet Funds are the ultimate owners and beneficiaries of the life insurance policies at issue in this case, which Skellig ICAV, acting solely in respect of its sub-funds, the Gannet Funds, holds in securities accounts maintained by Securities Intermediary.[8]   Securities

---

[7] Press Release, NYDFS, *Acting DFS Superintendent Lacewell Issues Consumer Alert Regarding Universal Life Insurance Policies* (Feb. 21, 2019), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1902211.

[8] Four of Gannet Life Settlement Fund I's policies at issue were purchased after the effective date of the COI Increases on those policies.  Gannet Life Settlement Fund I acquired "all of such Seller's right, title and interest in, to and under" those policies, which included all rights of recourse or recovery against John Hancock relating to the COI Increases.  All five of Gannet Fund II's policies at issue were purchased after the effective date of the COI Increases on those policies.  Gannet Fund II acquired "all of the Seller's right, title and interest in, to and under" or "all of Seller's rights, titles and interest in" those policies, which included all rights of recourse or recovery against John Hancock relating to the COI Increases.

COMPLAINT

Intermediary serves as securities intermediary for Skellig ICAV, in respect of Skellig ICAV's sub-funds, the Gannet Funds, pursuant to a Fifth Amended and Restated Program Administration and Subcustodial Agreement ("Gannet Life Settlement Fund I PACA"), dated as of December 17, 2021, between, among others, Skellig ICAV, acting solely in respect of its sub-fund, Gannet Life Settlement Fund I, and Wilmington Trust; and a Program Administration and Subcustodial Agreement ("Gannet Fund II PACA"), dated as of December 17, 2021, between, among others, Skellig ICAV, acting solely in respect of its sub-fund, Gannet Fund II, and Wilmington Trust.[9]  Under the Gannet Life Settlement Fund I PACA, each policy constitutes a "Pledged Financial Asset" that Securities Intermediary has credited to the securities accounts maintained in accordance with the Gannet Life Settlement Fund I PACA.  Gannet Life Settlement Fund I is the "beneficial owner" and "entitlement holder" under the Gannet Life Settlement Fund I PACA and is entitled to exercise the rights that comprise each "Pledged Financial Asset" credited to the securities accounts.  Under the Gannet Fund II PACA, each policy constitutes a "Financial Asset" that Securities Intermediary has credited to the securities accounts maintained in accordance with the agreement.  Gannet Fund II is the "beneficial owner" and "entitlement holder" under the Gannet Fund II PACA and is entitled to exercise the rights that comprise each "Financial Asset" credited to the securities account.  The Gannet Funds own the ultimate financial interests in the policies. Securities Intermediary for the Gannet Funds is identified as the owner and beneficiary of the policies on the records of the insurance company.

30.    Upon information and belief, Defendant John Hancock is a stock life insurance company incorporated in Michigan and headquartered in Boston,

---

[9] Here, as Securities Intermediary, Wilmington Trust is acting solely in its ministerial capacity as "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." U.C.C. § 8-102(a)(14)(ii).

COMPLAINT

Massachusetts.  In addition, in 2009, John Hancock acquired John Hancock Variable Life Insurance Company, the issuer of certain of Plaintiffs' Policies.  The parent of John Hancock is Manulife Financial Corporation ("Manulife"), a Canadian-based insurance and financial services holding company.  John Hancock, or its predecessor (John Hancock Variable Life Insurance Company), issued and holds all of the Performance UL policies hit by the COI Increases, including Plaintiffs' Policies. John Hancock is authorized to do business in the State of California and regularly conducts its business in the State of California, including within this judicial district, and issued several of Plaintiffs' Policies in the State of California.

## FACTUAL BACKGROUND

**A.**     **Plaintiffs Are Owners of John Hancock Universal Life Insurance Policies Subject to John Hancock's COI Increases**

31.     The Gannet Funds are the ultimate owners and beneficiaries of 15 John Hancock policies that are subject to John Hancock's COI Increases.  These policies were issued between June 2005 and September 2008 and range in face amount from $1 million to $10 million, and are listed on the attached **Exhibit 1**.  Plaintiffs' Policies were issued in the States of Arizona, California, Florida, Massachusetts, South Carolina, and Texas.  Sample Performance UL policies, redacted for privacy, are attached hereto as **Exhibits 2 and 3**.

32.     As is typical of universal life insurance policies, Plaintiffs' Policies provide that they will remain in force as long as there are sufficient funds in the policy account each month to cover the monthly deductions described in Plaintiffs' Policies. The monthly deductions generally consist of a premium charge, an administrative charge, a face amount charge, and a cost of insurance charge, plus charges for any policy riders.

33.     The cost of insurance charge is by far the largest and most significant charge.  This charge, also known as the mortality charge, reflects the price that John Hancock charges to cover the risk of death.  The cost of insurance charge is

determined by multiplying the cost of insurance rate by the net amount at risk.  The net amount at risk is essentially (with minor variation between some of the Policies) the death benefit, also known as the face amount, minus the Policy Value.  The Policy Value is deducted from the death benefit because, although the Policy Value is part of the death benefit paid upon the insured's death, policyholders do not pay cost of insurance on the Policy Value, which is the savings component of Plaintiffs' Policies and not the "insurance."

34.     The cost of insurance rates under a policy are based initially on certain characteristics of the insured, including his or her gender, age, and underwriting class (i.e., preferred plus, preferred, standard, and substandard classes).  The cost of insurance rates increase every year as the insured ages.

35.     Each of Plaintiffs' Policies has substantively identical language regarding how the COI rates will be determined.  One set of policies provides (or has substantially similar language):

> The Cost of Insurance Charge for a specific Policy Month is the charge for the Net Amount of Risk, including any Additional Ratings and any Supplementary Benefit riders which are part of the policy.  The charge for the Net Amount at Risk is an amount equal to the per dollar cost of insurance rate for that month multiplied by the Net Amount at Risk, and **will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions**.  The Maximum Monthly Rates at any age are shown in Section 2 as a rate per $1,000 of Net Amount at Risk.  To get the maximum rate per dollar, the rate shown must be divided by 1,000.  Each Cost of Insurance Charge is deducted in advance of the applicable insurance coverage for which we are at risk…We review our Cost of Insurance rates from time to time, and may re-determine Cost of Insurance rates at that time **on a basis that does not discriminate unfairly within any class of lives insured**.

*See, e.g.*, Ex. 2 at 12 (emphasis added).  A second set of policies provides (or has substantially similar language):

> The Applied Monthly Rates are the actual rates used to calculate the Cost of Insurance Charge.  We will determine the Applied Monthly Rates to be used for this policy.  The Applied Monthly Rates **will be based on our expectations of future investment earnings, persistency, mortality, expense and reinsurance costs**

COMPLAINT

***and future tax, reserve and capital requirements*** and will never be greater than the Maximum Monthly Rates shown in Section 2 divided by 1,000. They will be reviewed at least once every 5 Policy Years. Any change in Applied Monthly Rates ***will be made on a uniform basis*** for insureds of the same sex, Issue Age, and premium class, including smoker status, and whose policies have been in force the same length of time.

*See, e.g.*, Ex. 3 at 11 (emphasis added).

36.     Accordingly, among many other things, under the terms of Plaintiffs' Policies, cost of insurance rates: (a) can only be based on John Hancock's reasonable assumptions as to "future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions" (or substantially similar language), (b) cannot "discriminate unfairly within any class of lives insured" (or substantially similar language), and (c) cannot recoup past losses or be used to increase John Hancock's profitability.

**B.     Plaintiffs Acquired Their Policies in the Tertiary Market**

37.     Plaintiffs (and/or their predecessors) acquired their Policies in the tertiary market (sometimes, along with the secondary market, referred to generally as the "life settlement" market). A "life settlement" refers to the sale of a life insurance policy to a third party for a value greater than the policy's cash surrender value and less than the death benefit. The seller receives a cash payment, while the purchaser assumes all future premium payments and receives the death benefit upon the death of the insured.

38.     Life settlements are possible because life insurance policies, like other property, are freely assignable. *See Grigsby v. Russell*, 222 U.S. 149, 155-56 (1911). As Justice Oliver Wendell Holmes observed over a century ago, "life insurance has become in our days one of the best recognized forms of investment and self-compelled saving. So far as reasonable safety permits, it is desirable to give life policies the ordinary characteristics of property." Consistent with *Grigsby*, many state laws, including California law, expressly provide that life insurance policies are transferable. *E.g.,* Cal. Ins. Code § 10130 ("A life or disability policy may pass by

transfer, will or succession to any person, whether or not the transferee has an insurable interest.").

39.     Before the existence of a robust life settlement market for life insurance policies, consumers who owned a life insurance policy but no longer needed or wanted it (or could no longer afford it)—often a senior who had outlived his or her savings—had two economically inefficient options: (i) let the policy lapse and receive nothing in return for the termination of the policy; or (ii) surrender the policy back to the insurance company in exchange for a cash surrender value that was typically a nominal amount.  Lapsing or surrendering a policy almost always results in a loss to the consumer and a windfall for the insurance company, which keeps most, if not all, of the premiums paid to date and never has to pay any death benefits to the policyholder.  Without a competitive market of buyers (like the Gannet Funds), insurance companies held all the cards.  Senior insureds, lacking choices, held none.

40.     The emergence of the life settlement market for life insurance has addressed this market deficiency by providing consumers with a third, often superior option: they can sell (or "settle") their policies to someone other than the insurance company on an open and competitive market.  The buyer, often a bank, insurance company, or pension fund seeking investments uncorrelated to the traditional equity and debt capital markets, may offer the consumer as much as, or even more than, ten times the cash surrender value offered by the insurance company (in 2016, for example, insureds' policies sold for, on average, seven times the cash surrender value).[10]  The buyer continues to pay premiums and will receive the death benefit when the policy matures.  This life settlement market has benefited consumers, particularly older-aged policyholders who no longer wish to keep paying for life insurance, by providing a liquid market where they can sell their policies for fair

---

[10] Peter Hershon, *More than 8 in 10 Seniors Unaware of Life Settlement Option,* ThinkAdvisor, May 12, 2016, https://www.thinkadvisor.com/2016/05/12/more-than-8-in-10-seniors-unaware-of-life-settleme/?slreturn=20190824185302.

COMPLAINT

value as opposed to just lapsing or surrendering their policies to the insurance company that issued them and receiving nothing or very little in return (a big win for insurers but a big loss for consumers).

41.     Indeed, governmental agencies have recognized the benefits of the life settlement market to consumers.  For example, in a July 2010 Report to the United States Senate Special Committee on Aging, the Government Accountability Office ("GAO Report") observed: "A policy owner with unneeded life insurance can surrender the policy to the insurer for its cash surrender value.  Or, the owner may receive more by selling the policy to a third-party investor through a life settlement."[11]  The United States Securities and Exchange Commission similarly observed that "[i]nsured individuals or policy owners sell their policies in the secondary market rather than allowing them to lapse or surrendering them to the insurance company for cash value to maximize their asset."[12]

42.     Insurance companies like John Hancock embraced the life settlement market because it helped them sell more insurance.  Consumers who would not otherwise buy life insurance purchased insurance with the comfort they could later sell their policies for fair market value if they did not need or want to keep their policies.

43.     But after reaping the benefits of hundreds of millions, if not billions, of dollars in premiums collected over the past two decades, particularly from older-age[d] insureds, John Hancock has targeted many of these policies for COI increases.  Its purpose is clear: force policyholders, including investors that purchased their policies in the life settlement market, either to pay exorbitant rates to keep their policies in force or lapse or surrender their policies, thereby destroying the economic

---

[11] United States Government Accountability Office, Report to the Special Committee on Aging, U.S. Senate, "Life Insurance Settlements: Regulatory Inconsistencies May Pose a Number of Challenges," GAO-10-775, July 2010.

[12] Life Settlements Task Force, Staff Report to the United States Securities and Exchange Commission, July 22, 2010.

benefit of the policies.  If companies like John Hancock are not deterred from executing such a strategy, they will cripple—if not ultimately destroy—the life settlement market because life settlement market purchasers will not want to incur the risks of such unlawful rate increases.

44.   A weakened life settlement market would be of particular concern to senior insureds, who stand to lose significant value from any obstacles to selling their policies.  For example, one 2012 study showed that four out of ten seniors had lapsed or surrendered their life insurance policies;[13] another showed that, of those seniors who had lapsed or surrendered their policies, "90 percent" indicated they would have considered selling their policies in the life settlement market "had they known about it."[14]  The Life Insurance Settlement Association, citing a report using publicly available information from 2010, found that more than 250,000 universal and variable life insurance policies lapsed each year—with combined face values of over $57 billion—among seniors alone.[15]  Thus, when insurance companies like John Hancock impermissibly raise cost of insurance rates in contravention of the policies' clear contractual terms, they are hurting not only the policyholders, but also the entire life settlement market, including hundreds of thousands of senior consumers.

---

[13] *Four Out of Ten Lapse or Surrender Life Insurance,* BusinessWire, April 8, 2013, https://www.businesswire.com/news/home/20130408006630/en/Ten-Seniors-Lapse-Surrender-Life-Insurance (last visited August 25, 2022); *see also* Scott Page, *Let Life Insurance Lapse at Your Own Risk,* HuffPost, May 9, 2013, https://www.huffpost.com/entry/let-life-insurance-lapse-at-own-risk_b_3239095?guccounter=1 ("Individuals pay hundreds of millions of dollars into life insurance every year, yet four out of 10 seniors lapse or surrender their policies before they receive any payout.").

[14] Hershon, *supra* note 10.

[15] Darwin Bayston, *Lapsed Life Insurance Policies: An Astounding Number,* Life Insurance Settlement Association, February 24, 2015, https://www.lisa.org/life-policy-owners/consumer-blog/blog/2015/02/25/lapsed-life-insurance-policies-an-astounding-number.

**C.     John Hancock Raises Cost of Insurance Rates Solely on the Discriminated Group's Policies**

45.     In May 2018, John Hancock began notifying the Discriminated Group that it was raising the cost of insurance rates on certain of its Performance UL policies.  A sample letter for one of Plaintiffs' Policies is attached hereto as **Exhibit 4**.  The letter cryptically states that John Hancock's "expectation of future experience has changed, and therefore the Cost of Insurance rates on [the policyholder's] Performance UL policy will be increasing . . . ."  Ex. 4 at 1.  The letters contained no other reasons or justifications for the COI increase—they did not say how much the rate increase would be or explain how its expectation of future experience had changed, nor did they say what policies or policyholders were subject to a rate increase.  John Hancock has not offered any explanation for these disparate increases.

46.     In addition to the notice letters, a document that John Hancock released to brokers and agents (attached hereto as **Exhibit 5**) disclosed that the COI Increases—which John Hancock decided to apply to "a subset" of its Performance UL policies with increase amounts that vary (significantly) by policy—are "a result of changes in [John Hancock's] expectations of future mortality and lapse experience."  Ex. 5 at 1.  John Hancock further explained that, of 4,000 Performance UL policies that it reviewed for rate increases, it was raising rates on only 1,500.  *Id.* Again, John Hancock did not explain how changes in its mortality and lapse experience warranted a cost of insurance rate increase, why only 4,000 policies were selected for review out of the larger universe of Performance UL policies, why only 1,500 of those 4,000 were ultimately selected to receive a rate increase, or how it determined the significantly disparate COI rate increase amounts applied to each affected policy.

47.     In June of 2018, counsel for Plaintiffs, on behalf of other plaintiffs in a related litigation, sent public records requests for information about John Hancock's COI Increases to state insurance regulators, including NYDFS.  NYDFS responded

that it had documents responsive to Plaintiffs' counsel's requests, but that John Hancock had objected to NYDFS producing those documents on the basis they were confidential and trade secret.  After further correspondence, NYDFS produced a handful of heavily redacted documents that revealed very little about the COI Increases.

48.    Thus, before commencing this action, Plaintiffs were unable to obtain, either from John Hancock or from insurance regulators, any information evidencing the bases for John Hancock's COI Increases.  Because only John Hancock and its regulators have this information, John Hancock's refusal to provide the information has prevented policyholders like Plaintiffs from verifying the accuracy of John Hancock's representations that the COI Increases are justified.

49.    Regardless, it is apparent that John Hancock's COI Increases breach Plaintiffs' Policies in at least two ways.  ***First,*** the COI Increases unfairly discriminate against Plaintiffs in multiple respects.  ***Second,*** the COI Increases are not based on "expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions."  Rather, Plaintiffs are informed and believe, and on that basis allege, that in raising COI rates, John Hancock considered factors it could not consider under Plaintiffs' Policies, including increasing its profits and recouping past losses.

### D.    The COI Increases Unfairly Discriminate Against Plaintiffs

50.    Plaintiffs' Policies state that any changes in cost of insurance rates will "not discriminate unfairly within any class of lives insured" (or contain substantively similar language).  Aside from the unrelated discussion of beneficiary classes, the only "class" referred to in Plaintiffs' Policies is the "Risk Classification" and the "Premium Class."  *See, e.g.*, Ex. 2 at 3; Ex. 3 at 3.  But instead of implementing rate increases that are equitable to policyholders in a given class, John Hancock applied the COI Increases to an undefined subset of Performance UL policies, thus identifying a new class of policyholders to be the target of its rate increases.  John

COMPLAINT

Hancock also discriminated within this new class by applying materially different COI rate increase amounts to the affected policies.

51.     John Hancock has admitted to its brokers that it applied COI increases to 1,500 out of 4,000 Performance UL policies that it reviewed, and, on information and belief, there were thousands more Performance UL policies that John Hancock apparently did not even review for the purpose of implementing a COI increase. John Hancock has not revealed the criteria it used to target some policies with an increase and not others, but preliminary investigation reveals that there does not appear to be any actuarial justification for its choices. Similarly, John Hancock is applying significantly different increase amounts amongst the policies it is targeting, and there is no actuarial justification for this disparate treatment either.

52.     Further, John Hancock has not announced an increase in COI rates for any of its other universal life products, even though John Hancock issued other types of universal life policies between 2003 and 2010 (such as Majestic UL, SVULZ and Majestic VULX). These other products, by John Hancock's own admission, shared the same initial mortality assumptions as the Performance UL policies affected by the COI Increases. If John Hancock really had determined COI increases "based on expectations" as to mortality and lapses, as it claims, then its COI rates would have increased for a broad range of life insurance policies, and not just the (subset of) Performance UL policies. That John Hancock did not implement any such broad increase confirms that the COI Increases are being unlawfully used to target certain policies and policyholders in an inequitable manner and based on improper factors not provided for in Plaintiffs' Policies.

**E.     The COI Increases Are Not Based on Reasonable Expectations as to Future Cost Factors**

53.     Plaintiffs' Policies state (with minor variation) that the COI rates "will be based on [John Hancock's] expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax

COMPLAINT

1   assumptions."

2   54.   John Hancock has pointed to only two factors to justify the COI

3   Increases: "changes in [John Hancock's] expectations of future mortality and lapse

4   experience."   Not only does John Hancock ignore positive changes in some

5   enumerated factors (like "tax assumptions"), but also changes in these two factors

6   could not possibly warrant COI rate increases, much less the substantial increases

7   seen here.

8        1.   **The COI Increases Are Not Based on John Hancock's**

9             **Reasonable Expectations of Future Mortality**

10   55.   While mortality is the most significant factor in providing life insurance

11   coverage, it is well known in the life insurance industry that over the past three

12   decades, mortality has ***improved***, not worsened, and people are living much longer

13   than anticipated several years ago when John Hancock priced Plaintiffs' Policies.

14   For example, in 2015, the National Center for Health Statistics reported "[s]ignificant

15   decreases in mortality in 2014 compared with 2013" and observed that this year-to-

16   year improvement was "consistent with long-term trends."   "Although year-to-year

17   changes are usually relatively small," explained the National Center for Health

18   Statistics, "the age-adjusted death rate in the United States decreased 16.6% between

19   2000 (869.0) and 2014 (724.6)."   This "long-term trend" of improving mortality is

20   also evidenced by the releases of several new mortality tables over the past two

21   decades that would, if anything, support a decrease, not an increase, in COI rates.

22   56.   John Hancock's regulatory filings over the past several years also do not

23   reflect any adverse changes to mortality that would support the COI Increases.  Every

24   year, John Hancock files responses to form interrogatories with the National

25   Association of Insurance Commissioners ("NAIC"), which are signed by an actuary

26   at John Hancock, concerning John Hancock's "non-guaranteed elements" (which

27   include COI rates).   One of the form interrogatories asks insurers whether "the

28   anticipated factors underlying any nonguaranteed elements" are different from

COMPLAINT

current experience, and if so, insurers must describe in general the ways in which "future experience is anticipated to differ" and "the nonguaranteed element factors that are affected by such anticipation." For each year between 2006 and February 2016, John Hancock stated that, with exceptions not relevant here, "the anticipated experience factors underlying any nonguaranteed elements are not different from current experience" and that it "continue[s] to monitor experience." This means that as of February 2016, John Hancock admitted that its expectations of future mortality experience had not differed from its original expectations, and that no COI increases were on the horizon. There have not been adverse experience and expectations within recent years, or since February 2016, that could justify increases in COI rates, and certainly not ones of the magnitude seen here. Mortality—by far the biggest driver of COI rates—has been improving industry-wide at a rate of approximately 1% per year. Even if John Hancock has for some reason not shared in this mortality improvement, its mortality and lapse expectations could not have deviated so drastically in just two years to justify its massive COI Increases.

### 2. The COI Increases Are Not Based on John Hancock's Reasonable Expectations of Future Lapse Experience

57. Plaintiffs' Policies list "persistency" as one of the enumerated factors. John Hancock claims that the COI Increases are at least partly driven by a change in its expectations of future "persistency." But no change in persistency could warrant increases, much less ones of the size seen here, and John Hancock appears to misinterpret the "persistency" factor.

58. John Hancock told regulators as recently as a sworn filing in February 2016 that "the anticipated experience factors underlying any nonguaranteed elements," such as its lapse expectations, "are not different from current experience." There is no downturn in persistency or lapse experience in the last two years that could have warranted a change in lapse expectations for the worse, and certainly not so much as to cause the substantial increases imposed on the Discriminated Group's

policies.  John Hancock's admission that lapse expectations did not change between product issuance and February 2016 attests to the stability of lapse rates.  Industry studies also confirm that lapse rates do not vary much from year to year.  For example, a 2016 industry study by A.M. Best—an entity whose ratings Manulife quotes on its website—indicated that industry lapse rates between 2006-2015 only varied between approximately 5.3%-7%, which is far less variation than would be needed to justify even a few percentage points of a COI increase.

59.     Further, Plaintiffs' Policies were all issued between June 2005 and September 2008, so they had all been in force for at least nine years at the time John Hancock announced the COI Increases.  Any adverse lapse experience would have been detected in the early years of the Policies, not in the later years.  A 2012 industry study published by the Society of Actuaries—reporting on a survey of the industry including John Hancock—indicated that between 2001-2009, the industry lapse rates for universal life insurance policies that have been in force more than six years are stable, varying less than approximately two percentage points over that span, and that the lapse rates become more stable the longer the policy has been in force.  This indicates that any volatility that John Hancock may have seen in these policies would have occurred in the early years, not now, and given that John Hancock admitted in February 2016 that its lapse expectations had not changed, it is implausible that any change in lapse rates since issuance could justify a material change in COI rates.  Moreover, on its November 2017 earnings call, Manulife explained that Manulife's review of lapses in 2017 only focused "on lapse in Canada and parts of Asia," and that Manulife anticipates that it will "be reviewing lapse in the U.S. next year."  Given that John Hancock did not even conduct a "deep dive" review of its lapse assumptions in 2017 for U.S. business, John Hancock could not possibly have had a recent change in lapse expectations that would justify these substantial increases to Plaintiffs' Policies.

60.     John Hancock also appears to misinterpret the "persistency" factor to

mean that John Hancock is permitted to raise COI rates when *fewer* people lapse than John Hancock expected. The 2016 A.M. Best study indicates that industry lapse rates were at 20-year lows between 2012-2015. Similarly, John Hancock's 2016 financial statement indicated that lapse rates for its low-cost universal life products were reduced, which led to a decrease in net income attributed to shareholders. While an insurer may contend that in some circumstances it should be permitted to consider the loss of income resulting from *higher* lapses, it may not use lower lapses to justify a COI increase on the theory that John Hancock was counting on insureds to forget to pay their premiums. Plaintiffs' Policies do not permit John Hancock to punish its customers for paying their bills on time. Such a result would be unconscionable. As John Hancock told policyholders in announcing the rate hike, if policyholders do not increase their premiums or reduce their death benefit, then their policies will lapse. This is part of John Hancock's design: it is using the COI Increases to force the lapses it was counting on.

61.    In any event, even if John Hancock's lapse expectations are worse, lapses still would not justify John Hancock's substantial rate increases, particularly in the face of improving mortality and potentially other factors.

### 3.    The COI Increases Ignore John Hancock's Favorable Future Expectations, Such as Tax Assumptions and Investment Earnings

62.    While Plaintiffs' Policies (with minor variation) require that COI rates "will be based on [John Hancock's] expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions," John Hancock admitted to its agents that it ignored all but two of these factors and imposed the COI Increases "as a result of changes in our expectations of future mortality and lapse experience" alone. But John Hancock is not permitted to ignore enumerated factors that it does not like.

63.    For example, John Hancock ignores its favorable "tax assumptions."

Manulife, which owns and reports on behalf of John Hancock and its affiliates in the United States and international companies, has been publicly touting the massive benefits of U.S. Tax reform to its U.S. operations. For example, in early 2018, Manulife stated that the expected "impact" of "U.S. Tax Reform" enacted in the fourth quarter of 2017 is "an expected ongoing benefit to net income attributed to shareholders and core earnings of approximately ***$240 million per year*** commencing in 2018." This is on top of a series of "refinements" to John Hancock's actuarial models to "more accurately reflect the impact of tax timing differences on policy liabilities." John Hancock told investors that "[t]hese refinements resulted in a benefit to net income of $696 million."

64. John Hancock, however, simply ignored this huge expected future tax benefit, even though the policies list expectations of future "tax assumptions" as one of the factors that COI rates "will be based on."

65. John Hancock also recently admitted that as a result of a review of its future corporate "spread assumptions" (i.e., investment earnings), it claimed a $344 million benefit to net income attributed to shareholders. And yet John Hancock ignored this too, even though investment earnings are listed as an enumerated factor.

66. John Hancock cannot pick and choose to look only at the enumerated factors that it claims warrant an increase and ignore those that point in the other direction. But that is exactly what John Hancock did. If John Hancock had considered its future expected tax benefits, investment earnings, and other improvements among the enumerated factors, then a COI ***decrease*** would have been warranted, not an increase.

### 4. John Hancock Improperly Raised COI Rates to Increase Profitability

67. The COI Increases were also driven by John Hancock's desire to increase profits, which is not an enumerated factor. On an earnings call in November 2017, Manulife's CEO, Roy Gori, acknowledged that the company's North American

COMPLAINT

legacy business (which, on information and belief, includes the policies hit by this increase) was generating "less than acceptable" returns.  On the same earnings call, CEO Gori further stated that Manulife's first "priority" is to "aggressively manage" its legacy blocks to "increase profitability and cash generation."  The COI Increases, which were announced six months later, are clearly part of Manulife's effort to "increase profitability" on the legacy block of Performance UL policies issued between 2003 and 2010.  But increasing profits is not an enumerated factor on which an increase can be based under the terms of Plaintiffs' Policies.

## 5. <u>The COI Increases Recoup Past Losses</u>

68.     Plaintiffs' Policies require that COI rates "will be based on our expectation of future" experience factors.  This forbids COI rate increases that are based on John Hancock's desire to make up for past losses.  Basic actuarial principles that are incorporated into Plaintiffs' Policies also prohibit John Hancock from implementing COI rate increases that would result in John Hancock making more profit on the impacted policies than it previously expected using its prior expectations.  In an October 2017 earnings call, John Hancock admitted that the steps it was about to take, which included the COI Increases, were part of its effort to "aggressively manage" its legacy blocks in an attempt to "increase profits," in response to "less than acceptable returns" in the past.   That is impermissible recouping of past losses.

69.     In its financial statements, Manulife (reporting for John Hancock) claims to do an annual "full year review" of its actuarial assumptions, including its mortality assumptions.  In the interrogatories it files with regulators, John Hancock has also told regulators that it applies its updated mortality assumptions "by risk classification across all product lines."  To the extent John Hancock claims that its mortality has not been as good as it originally expected for some of these policies, John Hancock would have known about any such issues for more than a decade (and at least since the products were priced).  John Hancock cannot use COI rate increases

now to make up for alleged losses that, if John Hancock's story is to be believed, it must have known about long ago. To do so would be to recoup past losses, in violation of Plaintiffs' Policies and fundamental actuarial principles.

## COUNT I

### (Breach of Contract - Express)

### (All Policies)

70.     Plaintiffs reallege the allegations contained in paragraphs 1 through 69, inclusive, as if set forth fully herein.

71.     Plaintiffs' Policies are binding and enforceable contracts.

72.     John Hancock materially breached Plaintiffs' Policies in several respects, including but not limited to the following:

   a.     By increasing the cost of insurance rates on a basis that unfairly discriminates within the class of policyholders;

   b.     By increasing the cost of insurance rates on a basis other than "expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions" or expectations of "future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements"; and

   c.     By imposing excessive cost of insurance rates, including by failing to lower cost of insurance rates.

73.     Plaintiffs have performed all of their obligations under Plaintiffs' Policies, except to the extent that their obligations have been excused by John Hancock's conduct as alleged herein.

74.     As a direct and proximate cause of John Hancock's material breaches of Plaintiffs' Policies, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

COMPLAINT

## COUNT II

**(Implied Covenant of Good Faith and Fair Dealing – Contractual Breach)**

**(All Policies)**

75.     Plaintiffs reallege the allegations contained in paragraphs 1 through 69, inclusive, as if set forth fully herein.

76.     Plaintiffs' Policies are binding and enforceable contracts.

77.     Plaintiffs' Policies include an implied covenant, actionable in contract, that John Hancock will act in good faith and deal fairly with Plaintiffs.

78.     John Hancock materially breached Plaintiffs' Policies in several respects, including but not limited to the following:

a.     By only raising cost of insurance rates on a targeted group of Performance UL policies, thereby unfairly discriminating within the class of policyholders;

b.     By charging excessive cost of insurance rates, thereby denying Plaintiffs the benefit of their actual Policy Values;

c.     By failing to lower cost of insurance rates;

d.     By improperly targeting its rate increases at policyholders, including Plaintiffs, who have chosen to exercise their right to fund their policies as they choose;

e.     By increasing the cost of insurance rates in an attempt to achieve John Hancock's original expected profitability for the Performance UL policies at its policyholders' expense;

f.     By attempting to force Plaintiffs and other policyholders to either (a) pay exorbitant premiums that John Hancock knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid to date; and

g.     By failing to provide any meaningful disclosures about the COI Increases.

COMPLAINT

79.     Plaintiffs have performed all of their obligations under Plaintiffs'
Policies, except to the extent that their obligations have been excused by John
Hancock's conduct as alleged herein.

80.     John Hancock's breaches were conscious, deliberate, and unreasonable
acts, which were designed to and which did unfairly frustrate the agreed common
purposes of Plaintiffs' Policies and which disappointed Plaintiffs' reasonable
expectations by denying Plaintiffs the benefits of Plaintiffs' Policies.

81.     As a direct and proximate cause of John Hancock's breaches of the
implied covenant of good faith and fair dealing, Plaintiffs have been damaged as
alleged herein in an amount to be proven at trial, but in any event that exceeds
$75,000, exclusive of interest.

## **COUNT III**

### **(Implied Covenant of Good Faith and Fair Dealing – Tortious Breach)**
### **(Policies Issued in California)**

82.     Plaintiffs reallege the allegations contained in paragraphs 1 through 69,
inclusive, as if set forth fully herein.

83.     Plaintiffs' Policies are binding and enforceable contracts.

84.     Plaintiffs' Policies include an implied covenant that John Hancock will
act in good faith and deal fairly with Plaintiffs.

85.     John Hancock materially breached Plaintiffs' Policies in several
respects, including, but not limited to, the following:

a.     By only raising cost of insurance rates on a targeted group of
Performance UL policies, thereby unfairly discriminating within the
class of policyholders;

b.     By charging excessive cost of insurance rates, thereby denying Plaintiffs
the benefit of their actual Policy Values;

COMPLAINT

c.  By increasing the cost of insurance rates in an attempt to achieve John Hancock's original expected profitability for Plaintiffs' Policies at its policyholders' expense;

d.  By attempting to force Plaintiffs and other policyholders to either (a) pay exorbitant premiums that John Hancock knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid to date; and

e.  By failing to provide any meaningful disclosures about the COI Increases.

86.  Plaintiffs have performed all of their obligations under Plaintiffs' Policies, except to the extent that their obligations have been excused by John Hancock's conduct as alleged herein.

87.  John Hancock's breaches were conscious, deliberate, and unreasonable acts, which were designed to and which did unfairly frustrate the agreed common purposes of Plaintiffs' Policies and which disappointed Plaintiffs' reasonable expectations by denying Plaintiffs the insurance benefits of Plaintiffs' Policies, including the Policy Value, due to Plaintiffs under Plaintiffs' Policies.  Furthermore, John Hancock's bad faith attempt to force Plaintiffs and other policyholders either to (a) pay exorbitant premiums that John Hancock knows would no longer justify the ultimate death benefits (and, therefore, reduce the value of the ultimate death benefits), or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid to date, harms consumers, particularly older-aged insureds, because it will have a chilling effect on the life settlement market for life insurance and deprive elderly insureds of the option to sell their policies rather than lapse or surrender them. With a healthy life settlement market, older-aged insureds who can no longer obtain alternative life insurance due to insurers' rate increases can at least obtain financial security by selling their policies for a fair market value.  That return will greatly diminish if John Hancock can raise rates unlawfully with impunity and investors will

1   not be afforded the same remedies and protections as other policyholders.

2   88.   As a direct and proximate cause of John Hancock's breaches of the

3   implied covenant of good faith and fair dealing, Plaintiffs have been damaged as

4   alleged herein in an amount to be proven at trial, but in any event that exceeds

5   $75,000, exclusive of interest.  Furthermore, John Hancock's conduct was conscious

6   and deliberate, and constitutes oppression, fraud, or malice, justifying an award of

7   punitive damages.

8                                **<u>COUNT IV</u>**

9                                **(Conversion)**

10                               **(All Policies)**

11  89.   Plaintiffs reallege the allegations contained in paragraphs 1 through 69,

12  inclusive, as if set forth fully herein.

13  90.   Plaintiffs had a property interest in the funds John Hancock deducted

14  from their Policy Values in excess of the amounts permitted by the terms of Plaintiffs'

15  Policies due to John Hancock's wrongful increases in cost of insurance rates.

16  91.   Plaintiffs had the right to immediately possess the funds from their

17  Policy Value through a variety of contractual measures, including withdrawals.  The

18  specific amount capable of withdrawal is determinable by a specific calculation

19  included in each policy contract.  *See, e.g.*, Ex. 2 at 14-15.

20  92.   John Hancock intentionally and substantially interfered with that

21  property interest.  By increasing cost of insurance rates and making Monthly

22  Deductions in unauthorized amounts from the Policy Values of Plaintiffs' Policies,

23  John Hancock assumed and exercised ownership over, and misappropriated or

24  misapplied, specific funds placed in the custody of John Hancock for the benefit of

25  Plaintiffs, without authorization or consent and in hostility to the rights of Plaintiffs.

26  93.   John Hancock continues to retain these funds unlawfully.  At no time

27  did Plaintiffs consent to such wrongful deduction and retention of funds by

28  Defendants.

94.     John Hancock's wrongful exercise of control over the personal property of Plaintiffs constitutes conversion.

95.     John Hancock intended to cause damage to the Plaintiffs by increasing cost of insurance rates and deducting more from Plaintiffs' Policy Values than was authorized by Plaintiffs' Policies.

96.     As a direct and proximate result of John Hancock's conduct, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.   Furthermore, John Hancock's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

**COUNT V**

**(Declaratory Relief)**

**(All Policies)**

97.     Plaintiffs reallege the allegations contained in paragraphs 1 through 69, inclusive, as if set forth fully herein.

98.     For reasons including, but not limited to, those stated herein, there exists an actual dispute and controversy between Plaintiffs and John Hancock concerning Plaintiffs' rights and John Hancock's obligations under Plaintiffs' Policies, including, but not limited to, how John Hancock must implement any change in the cost of insurance rates and under what circumstances John Hancock may change the cost of insurance rates.

99.     Accordingly, Plaintiffs seek a declaration (a) that John Hancock's cost of insurance rate increases are improper under Plaintiffs' Policies and that any excess premiums received must be returned or the Policies' Policy Values recalculated according to the original cost of insurance rates, and (b) setting forth the specific guidelines that govern the factual circumstances under which John Hancock can raise the cost of insurance rates.

100.   Such a declaration will help prevent or limit any future controversies

COMPLAINT

under Plaintiffs' Policies by providing guidance as to when and how John Hancock can change the cost of insurance rates on in-force Performance UL policies.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

### **On the First Count**

1.    For compensatory damages in an amount to be determined at trial;

2.    For an award of pre-judgment and post-judgment interest;

3.    For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.    For such other and further relief as the Court may deem proper.

### **On the Second Count**

1.    For compensatory damages in an amount to be determined at trial;

2.    For an award of pre-judgment and post-judgment interest;

3.    For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.    For such other and further relief as the Court may deem proper.

### **On the Third Count**

1.    For compensatory damages in an amount to be determined at trial;

2.    For punitive damages in an amount to be determined at trial;

3.    For an award of pre-judgment and post-judgment interest;

4.    For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

5.    For such other and further relief as the Court may deem proper.

### **On the Fourth Count**

1.    For compensatory damages in an amount to be determined at trial;

2.    For punitive damages in an amount to be determined at trial;

3.    For an award of pre-judgment and post-judgment interest;

COMPLAINT

4.  For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

5.  For such other and further relief as the Court may deem proper.

### On the Fifth Count

1.  For a declaration (a) that John Hancock's cost of insurance rate increases are improper under Plaintiffs' Policies and that any excess premiums received must be returned or the Policies' Policy Values recalculated according to the original cost of insurance rates, and (b) setting forth the specific guidelines that govern the factual circumstances under which John Hancock can raise the cost of insurance rates;

2.  For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

3.  For such other and further relief as the Court may deem proper.

- 35 -

Dated:        September 8, 2022

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:                   */s/ Khai LeQuang*
                          KHAI LEQUANG

Attorneys for Plaintiffs SKELLIG ICAV, acting solely in respect of its sub-funds, GANNET LIFE SETTLEMENT FUND I and GANNET FUND II; and WILMINGTON TRUST, NATIONAL ASSOCIATION, as securities intermediary for SKELLIG ICAV, in respect of SKELLIG ICAV's sub-funds, GANNET LIFE SETTLEMENT FUND I and GANNET FUND II

- 36 -

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:        September 8, 2022

ORRICK, HERRINGTON & SUTCLIFFE LLP


By:        */s/ Khai LeQuang*
              KHAI LEQUANG

Attorneys for Plaintiffs SKELLIG ICAV, acting solely in respect of its sub-funds, GANNET LIFE SETTLEMENT FUND I and GANNET FUND II; and WILMINGTON TRUST, NATIONAL ASSOCIATION, as securities intermediary for SKELLIG ICAV, in respect of SKELLIG ICAV's sub-funds, GANNET LIFE SETTLEMENT FUND I and GANNET FUND II

COMPLAINT